# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRICE CHARLES B.,[1] <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Acting Commissioner of Social Security, <br><br> Defendant. | Case No. 2:18-cv-01021-AFM <br><br> **MEMORANDUM OPINION AND ORDER AFFIRMING DECISION OF COMMISSIONER** |

Plaintiff filed this action seeking review of the Commissioner's final decision denying his application for disability insurance benefits. In accordance with the Court's case management order, the parties have filed memorandum briefs addressing the merits of the disputed issues. The matter is now ready for decision.

## BACKGROUND

On July 25, 2014, Plaintiff applied for disability insurance benefits, alleging disability since April 6, 2013. Plaintiff's application was denied. (Administrative

---

[1] Plaintiff's name has been partially redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

Record ["AR"] 95-97, 172-175.) A hearing took place on September 13, 2016 before an Administrative Law Judge ("ALJ"). Plaintiff, who was represented by counsel, testified at the hearing, as did a vocational expert ("VE") and a medical expert ("ME"). (AR 30-75.)

In a decision dated November 22, 2016, the ALJ found that Plaintiff suffered from the severe impairments of aortic valve disease status post replacement and cervical spine kyphosis. (AR 17.) The ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following restrictions: only occasionally climb ladders, ropes, or scaffolds; no more than occasional bilateral overhead reaching; avoid exposure to unprotected heights, moving mechanical parts, humidity, wetness, and temperature extremes; and occasional exposure to dusts, odors, fumes, or pulmonary irritants. (AR 19.) Relying upon the testimony of the VE, the ALJ found that Plaintiff was capable of performing his past relevant work as a dentist. (AR 24.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (AR 24-25.)

The Appeals Council subsequently denied Plaintiff's request for review (AR 1-6), rendering the ALJ's decision the final decision of the Commissioner.

## DISPUTED ISSUES

1. Whether the ALJ properly evaluated the opinion of treating physician, Erik Spayde, M.D.
2. Whether the ALJ properly considered the evidence, including Plaintiff's testimony, in assessing Plaintiff's RFC.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *See*

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This Court must review the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Lingenfelter*, 504 F.3d at 1035. Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

**DISCUSSION**

**1. The ALJ provided legally sufficient reasons for discounting Dr. Spayde's opinion.**

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons to reject the opinion of his treating physician, Erik Spayde, M.D. (ECF No. 23 at 15-21; ECF No. 28 at 2-3.) For the following reasons, Plaintiff's contention lacks merit.

**A. Relevant Medical Evidence.**

On October 4, 2012, Plaintiff saw Brian D. Rubin, M.D. for complaints of neck pain. (AR 267-268.) Dr. Rubin noted that Plaintiff's range of motion of the cervical spine was restricted, palpitation revealed mild tenderness in the midline cervical spine, and Plaintiff suffered from an "obvious cervical kyphosis."[2] (AR 261.) Plaintiff was "neurologically intact." (AR 262.) Dr. Rubin ordered diagnostic tests. (AR 262-263.)

At his initial appointment with Dr. Spayde on October 17, 2012, Plaintiff reported experiencing neck pain for ten years. According to Plaintiff, his neck "is fatigued if he is not looking down." (AR 665.) Physical examination revealed loss of lordosis, no asymmetry, no tenderness of the cervical spine, a negative Spurling's Test, no tenderness to palpation, and no muscle spasm. Plaintiff's upper extremity

---

[2] Kyphosis is a curvature of the spine. (*See* AR 49.)

reflexes were normal and his sensation was intact. With regard to range of motion, Dr. Spayde found Plaintiff's forward and backward flexion and extension to be 45 degrees without discomfort, left and right tilt was 30 degrees without discomfort, and left and right rotation was 60 degrees without discomfort. (AR 665-666.) Dr. Spayde diagnosed Plaintiff with degeneration of cervical intervertebral disc, cervical spondylosis, kyphosis (acquired) (postural), and cervicalgia. (AR 666.) He noted that Plaintiff was not interested in surgical intervention, but was interested in "recommendations for maintaining his livelihood and prognosis given his symptoms and diagnoses." (AR 666.) Dr. Spayde indicated that an MRI should be obtained.

An MRI of Plaintiff's cervical spine was performed on October 24, 2012. It revealed no large disc bulges or canal stenosis; multiple disc bulges less than 3 mm.; and multilevel mild to moderate neural foraminal stenosis. (AR 273-274.)

On November 5, 2012, Plaintiff returned to Dr. Spayde to review the MRI results. A physical examination was the same as in October 2012. Dr. Spayde noted that the MRI results showed kyphosis, multiple disc bulges, and multilevel disc degeneration. (AR 663.) Dr. Spayde's diagnoses remained the same. Dr. Spayde recommended physical therapy. (AR 664.)

Physical examination in January 2013 revealed the same findings as prior examinations, and Dr. Spayde's diagnoses remained the same. (AR 661.) Dr. Spayde's notes indicate that Plaintiff's ongoing neck pain "is highly related to his kyphotic deformity. The deformity is directly related to the posture with practicing dentistry. He is continuing with physical therapy and home exercises." (AR 662.)

Physical therapy notes from this time indicate that Plaintiff benefitted from therapy and was making slow progress. (*See* AR 670-671.)

Plaintiff saw Dr. Spayde again in May 2013. Dr. Spayde noted that Plaintiff was status post open heart surgery and noted that Plaintiff stopped working on April 5, 2013. (AR 659.) Physical examination revealed the same findings as in

January 2013 and Dr. Spayde's diagnoses remained the same. (AR 659.) According to Dr. Spayde's treatment notes, Plaintiff

> has ongoing disability related to his cervical spine and severe kyphosis. Regardless of his cardiac condition, he would be unable to work at this point due to his ongoing neck symptoms. His neck was aggravated temporarily by the heart surgery. He has pain in the back of the neck. He will continue PT [physical therapy].

(AR 660.)

Plaintiff had a follow up appointment with Dr. Spayde on December 18, 2013. Physical examination revealed the same findings as prior examinations and Dr. Spayde's diagnoses remained the same. Dr. Spayde indicated "[Plaintiff] is not [to] do overhead heavy weight lifting or exercises that strain the neck. I encourage him to continue working out at the gym. He will avoid excessive neck flexion for prolonged periods." (AR 657-658.) Dr. Spayde also recommended that Plaintiff begin physical therapy 2-3 times a week. He indicated Plaintiff should return for a follow-up in six weeks. (AR 658.) Plaintiff next saw Dr. Spayde in January 2015.

Meanwhile, on November 6, 2014, Sean K. Hirota, M.D. performed a complete internal medicine evaluation of Plaintiff at the request of the Social Security Administration. (AR 680.) On examination, Dr. Hirota found tenderness to palpation in the midline and paracervical spinal regions; severe kyphosis; and limited range of motion of the cervical spine. He noted that when Plaintiff walked, "his head is angulated downwards from time to time." (AR 683.) Dr. Hirota's diagnostic impressions included "Kyphosis: severe spinal deformity with reduced range of motion [of] the cervical spine." (AR 684.) Dr. Hirota opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; could stand or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; frequently perform postural activities such as bending, stooping, kneeling, and crouching. (AR 684-685.) However, given Plaintiff's restricted range of motion in his cervical spine,

he was limited to "only occasionally perform[ing] postural activities such as climbing." (AR 685.) Dr. Hirota opined Plaintiff was not limited in regard to gross motor skills or fine motor skills. (AR 685.)

Dr. Spayde examined Plaintiff in January 2015. Plaintiff reported "pain with wearing heavy jackets" and "carrying heavy loads." Plaintiff had not started physical therapy, but said that he was "interested in starting in February." (AR 690.) Dr. Spayde's physical examination revealed the same findings as those during prior visits and his diagnoses remained the same. (AR 690.) Dr. Spayde recommended physical therapy and ordered an updated MRI. (AR 690.)

A second MRI of Plaintiff's cervical spine was performed on February 9, 2015. The results revealed multilevel mild degenerative changes; no central canal stenosis; and scattered foraminal stenosis. There were no significant changes compared to the October 24, 2012 MRI. (AR 700-701.)

Plaintiff's saw Dr. Spayde next in August 2016 – more than a year and a half after his last visit. Under a section of his treatment notes entitled "Follow Up Patient Information," Dr. Spayde wrote that Plaintiff "is still having neck symptoms. He is unable to work due to ongoing neck disability. He has severe kyphosis." (AR 830.) Dr. Spayde performed a physical examination. The results were identical to those at prior appointments. Dr. Spayde recommended that Plaintiff continue physical therapy. (AR 830.) Cervical spine X-rays obtained during that visit showed mild dextroscoliosis; kyphosis; and multilevel degenerative disc disease. (AR 830.)

In September 2016, Burt O. Tokurara, M.D. evaluated Plaintiff based upon complaints of hip pain. Physical examination revealed tenderness and multiple active trigger points in Plaintiff's lumbar, thoracic, and cervical spine. (AR 834-835.) Dr. Tokuhara noted that Plaintiff exhibited severe anterior head carriage and severe thoracic hyperkyphosis. In addition, Plaintiff had a reduced range of motion of the cervical spine. (AR 835.) A cervical compression test and a maximum cervical rotary compression test were positive. (AR 836.) Among other things, Dr. Tokuhara

diagnosed Plaintiff with cervical disc degeneration; cervicalgia; and cervical disc disorder with radiculopathy. (AR 836-837.) He treated Plaintiff with a chiropractic adjustment, ultrasound, and muscle stimulation. (AR 837.)

At the hearing, Joseph Gaeta, M.D. testified as a medical expert. Dr. Gaeta reviewed Plaintiff's medical records and opined that Plaintiff had cardiac impairment, degenerative disc disease of the neck, and cervical spine kyphosis. (AR 39-40.) With respect to Plaintiff's cardiac impairment, Dr. Gaeta opined Plaintiff was limited to light exertional work. (AR 43-44.) With respect to Plaintiff's cervical spine impairment, Dr. Gaeta noted that Dr. Spayde had recommended that Plaintiff not lift anything heavy over his head, but encouraged Plaintiff to go to the gym. Thus, Dr. Gaeta included a restriction of overhead lifting. (AR 44-45.) He also noted that Plaintiff's MRI findings had not changed since 2012 and the physical examination findings remained constant. (AR 41-42, 44-45.) When the ALJ asked about Dr. Spayde's comment that Plaintiff avoid excessive flexion for prolonged periods of time, Dr. Gaeta testified that this recommendation did not impose restrictions greater than those incorporated in light exertional work. Plaintiff's counsel inquired further about Dr. Spayde's statement regarding excessive neck flexion for prolonged periods of time. Dr. Gaeta explained that flexion refers to moving the head down. He testified that the term "long periods" is open to interpretation. In Dr. Gaeta's opinion, nothing suggested that Plaintiff could not flex his cervical spine occasionally (i.e., 33% of the time) or more. (AR 44-49.)

**B. Relevant Law.**

The medical opinion of a claimant's treating physician is entitled to controlling weight so long as it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). If a treating physician's medical opinion is uncontradicted, the ALJ may only reject it based on clear and convincing reasons. *Trevizo*, 871 F.3d at

675; *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). If a treating physician's opinion is contradicted, the ALJ must provide specific and legitimate reasons supported by substantial evidence in the record before rejecting it. *Trevizo*, 871 F.3d at 675; *Ghanim v. Colvin*, 763 F.3d 1154, 1160-1061 (9th Cir. 2014); *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Trevizo*, 871 F.3d at 675 (citations and internal quotation marks omitted).

Here, Dr. Spayde's opinion was contradicted by the opinions of the State agency medical consultant, the examining physician Dr. Hirota, and the medical expert Dr. Gaeta, all of whom opined that Plaintiff could perform work at the light or medium exertional level. Consequently, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence in the record for rejecting Dr. Spayde's opinion. *Orn*, 495 F.3d at 632.

**3. Analysis.**

In assessing Plaintiff's RFC, the ALJ assigned great weight to the opinion of Dr. Gaeta. The ALJ noted that Dr. Gaeta had reviewed the entire record and found his opinion reasonable and consistent with the objective medical evidence. (AR 23.) The ALJ also gave great weight to the opinion of the State agency medical consultant, who opined that Plaintiff was limited to light work, finding that opinion consistent with the objective medical evidence which showed infrequent and conservative treatment for Plaintiff's cervical spine. (AR 23.) The ALJ gave partial weight to the opinion of Dr. Hirota that Plaintiff could perform work at the moderate exertional level, explaining that the objective medical evidence supported a finding that Plaintiff was more limited than Dr. Hirota opined. (AR 23-24.)

The ALJ considered Dr. Spayde's opinion and provided three reasons for rejecting that opinion. To begin with, the ALJ noted that Dr. Spayde's opinion that

8

Plaintiff was unable to work due to his neck impairment was an opinion on the ultimate issue reserved for the Commissioner and, therefore, not entitled to controlling weight or special significance. (AR 24.)

This is a correct statement of the law. The regulations provide that a treating physician's opinion on the ultimate issue of disability is not entitled to controlling weight, because statements by a medical source that a claimant is "disabled" or "unable to work " are not medical opinions. 20 C.F.R. §§ 404.1527(e), 416.927(e); *see Tristan v. Berryhill*, __ F. App'x __, 2019 WL 581362, at *1 (9th Cir. Feb. 13, 2019) ("The ALJ properly rejected Dr. Posner's opinion that Tristan was unable to work as an opinion on an issue reserved to the Commissioner."); Social Security Ruling (SSR) 96-5p2, 1996 WL 374183, at *3, (July 2, 1996) (medical opinion on issues reserved to the Commissioner – including whether an individual is disabled – are not entitled to special significance). Nevertheless, while the ALJ is not bound by a treating physician's opinion on the ultimate issue of disability, he still cannot reject it without presenting legally sufficient reasons for doing so. *See Hill v. Astrue*, 698 F.3d 1153, 1159-1160 (9th Cir. 2012); *Draper v. Colvin*, 2016 WL 6072344, at *3 (C.D. Cal. Oct. 17, 2016). Here, the ALJ provided two such reasons.

First, the ALJ explained that Plaintiff's actual treatment visits for his neck impairment were infrequent. Specifically, the ALJ pointed to gaps of one year and one and a half years between visits. (AR 24.). The ALJ could properly consider the infrequency of Plaintiff's treatment in determining the weight to attribute to Dr. Spayde's opinion. *See Woodmass v. Berryhill*, 707 F. App'x 432, 435 (9th Cir. 2017) ("although treating Woodmass every six months may suggest familiarity with her condition, this relatively infrequent treatment also contradicted the seriousness of Woodmass's symptoms") (citing 20 C.F.R. § 404.1527(c)(2)(i)); *Lusardi v. Astrue*, 350 F. App'x 169, 171-172 (9th Cir. 2009) (ALJ's assignment of minimal weight to treating physician's opinion satisfied the clear and convincing standard where the ALJ noted the doctor's infrequent visits with the claimant); *see generally,*

*Orn*, 495 F.3d at 631 (where treating physician's opinion is contradicted by other evidence, the ALJ should consider factors including "the length of the treatment relationship and the frequency of examination" in deciding what weight to give the opinion).

Second, the ALJ concluded that Dr. Spayde's "own reports failed to reflect the type of significant clinical and laboratory abnormalities one would expect" if Plaintiff were disabled. (AR 24.) As an example, the ALJ noted that Dr. Spayde consistently assessed Plaintiff with intact reflexes, sensation, and motor strength in the bilateral upper extremities and had consistently negative Spurling tests. (AR 24 [citing AR 657, 659, 690, 830].) The ALJ could properly reject the treating physician's opinion on the ground that it was not adequately supported by objective medical findings. *See Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012); *Batson v. Commissioner*, 359 F.3d 1190, 1195 (9th Cir. 2004). Furthermore, the ALJ's reason is supported by substantial evidence. As set forth above, other than a limited range of motion, Dr. Spayde's physical examinations consistently reflected minimal findings – including no tenderness on axial compression, no tenderness to palpation, no muscle spasm, negative Spurling's Test, normal reflexes, sensation, and motor examinations. (AR 657, 659, 661, 663, 665-666, 690, 830.)

Plaintiff argues that the MRI results constitute objective findings supporting Dr. Spayde's opinion. (ECF No. 23 at 20.) Plaintiff is correct that Dr. Spayde's treatment notes mention the MRI findings. In particular, Dr. Spayde noted that the MRI findings showed cervical kyphosis, multiple disc bulges and multilevel disc degeneration. (*See, e.g.,* AR 657, 659, 690.) Nevertheless, as the ALJ correctly noted, the MRI results revealed *small* disc bulges and *mild to moderate* foraminal stenosis, but no central canal stenosis and no nerve root impingement. (AR 21; *see* AR 273-274, 700-701(MRI findings describing "trace" or "minimal" disc bulges and "mild" degenerative changes.). Further, the ALJ pointed to Dr. Gaeta's testimony regarding the nature of the MRI results – namely, that findings of degenerative disc disease are

common in people as they age and that Plaintiff's 2015 MRI results showed no changes from the 2012 MRI results. (AR 22-24; *see* AR 273-274, 700-701.) Accordingly, the ALJ could properly rely on a lack of objective clinical support in rejecting Dr. Spayde's opinion. *Gonzalez v. Astrue*, 2013 WL 394415, at *7-8 (E.D. Cal. Jan. 30, 2013) (ALJ properly rejected treating physician opinion for lack of objective support where MRI and CT scans revealed "mild stenosis"); *Coelho v. Astrue*, 2011 WL 3501734, at *6 (N.D. Cal. Aug. 10, 2011) (ALJ met his burden of providing a specific, legitimate reason to reject the treating physicians' opinions for lack of supporting objective evidence where evidence of cervical spine condition included an MRI showing stenosis in 2002; an X-ray showing degenerative changes in 2004; and an MRI showing disc narrowing, desiccation, and posterior disc bulging, but normal cord signal), *aff'd, Coelho v. Colvin*, 525 F. App'x 637 (9th Cir. 2013).

Plaintiff also contends that the ALJ erroneously rejected Dr. Spayde's opinion limiting Plaintiff from prolonged neck flexion. (ECF No. 28 at 2-3.) Plaintiff's claim is based upon Dr. Spayde's treatment notes from December 2013, which include the following notation:

> Plaintiff is not [to] do overhead heavy weight lifting or exercises that strain the neck. I encourage him to continue working out at the gym. He will avoid excessive neck flexion for prolonged periods.

(AR 658.)

Dr. Spayde's note is open to interpretation. To begin with, it is not clear that the foregoing notation was meant to reflect Dr. Spayde's medical opinion that Plaintiff suffered from permanent functional limitations. Fairly read, Dr. Spayde's statement appears to reflect advice regarding Plaintiff's planned exercises. Furthermore, this alleged medical opinion is not reiterated in any other of Dr. Spayde's reports and, as such, appears to be a temporary one.

In any event, Dr. Gaeta testified that "avoiding excessive neck flexion for prolonged periods" was not inconsistent with the ability to perform light work. In the

absence of contrary evidence, the ALJ was entitled to rely on Dr. Gaeta's testimony. Thus, the ALJ did not reject Dr. Spayde's opinion in assessing Plaintiff's RFC.

**2.    The ALJ did not commit error in concluding that Plaintiff could perform his past relevant work as a dentist.**

Plaintiff contends that the ALJ failed to properly evaluate the evidence in reaching his conclusion that Plaintiff could perform his past relevant work as a dentist, DOT 072.101-010. Although set out under a single contention, Plaintiff actually makes two separate claims.

First, Plaintiff contends that an RFC precluding exposure to moving mechanical parts is inconsistent with the occupation of a dentist. Plaintiff argues that "a limitation to avoid moving mechanical parts should include the tools and instruments used by dentists, since a wrong move or miscalculation could have serious consequences for the health and safety of the patients." Thus, Plaintiff reasons, the ALJ erred by adopting the VE's testimony and concluding that he was capable of performing his past relevant work. (ECF No. 23 at 22.)

Dr. Gaeta testified that Plaintiff should not work around heights or moving machinery and should not climb ladders or scaffolds because Plaintiff was on anticoagulant therapy with the medication warfarin (Coumadin) for his heart condition. (AR 44.)[3] As discussed, the ALJ assigned great weight to Dr. Gaeta's opinion and adopted these environmental restrictions in assessing Plaintiff's RFC. (*See* AR 50.)

At Step Four of the Commissioner's sequential evaluation process, a claimant has the burden of showing that he can no longer perform his past relevant work. *See Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001); 20 C.F.R. § 404.1520(e). The ALJ must determine whether the claimant can perform the actual functional demands

---

[3] Warfarin prevents blood from clotting. As a result, it may take longer than usual for a user of the medication to stop bleeding if cut or injured. Individuals prescribed warfarin are cautioned to "[a]void activities or sports that have a high risk of causing injury." *See* https://medlineplus.gov/druginfo/meds/a682277.html.

12

and duties of a particular past relevant job, or the functional demands and duties of the occupation as generally required by employers throughout the national economy. *Pinto*, 249 F.3d at 845 (citing SSR 82–61, 1982 WL 31387, at *2). In making this determination, the ALJ may rely on the Dictionary of Occupational Titles ("DOT") or the expertise of a vocational expert. *See Gutierrez v. Colvin*, 844 F.3d 804, 807 (9th Cir. 2016); *Esparza v. Astrue*, 2011 WL 5037049, at *9 (C.D. Cal. Oct. 24, 2011) (citing 20 C.F.R. § 404.1560(b)(2) (A VE or vocational specialist ("VS") can be used at step four to determine whether a plaintiff can perform his or her past relevant work)). The DOT is the Commissioner's "'primary source of reliable job information' and creates a rebuttable presumption as to job classification." *Gribben v. Colvin*, 2016 WL 5842188, at *3 (C.D. Cal. Oct. 4, 2016) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 n.6, 1435 (9th Cir. 1995)). If there is an "apparent unresolved conflict" between the DOT and the VE's testimony regarding the claimant's ability to perform an occupation, the ALJ must ask the VE to resolve the conflict before the ALJ can rely on the testimony. SSR 00–4p, 2000 WL 1898704, at *2 (2000). A conflict is "apparent" if the DOT's listed occupational "requirements that are essential, integral, or expected" for a particular occupation conflict with the VE's testimony. *Gutierrez*, 844 F.3d at 808.

Here, the ALJ asked the VE whether a hypothetical claimant with an RFC that included avoiding exposure to moving mechanical parts[4] could perform work as a dentist. The VE testified affirmatively. (AR 70-71.) The VE's testimony was entirely consistent with the DOT because exposure to moving mechanical parts is expressly not present in the job of dentist. D.O.T. 072.101-010, 1991 WL 646699 ("Moving Mech. Parts: Not Present - Activity or condition does not exist"). Because there was

---

[4] Appendix D of the Selected Characteristics of Occupations ("SCO") sets forth environmental conditions describing possible surroundings or settings in which an occupation is found or a job performed. One of those conditions is "Proximity to Moving Mechanical Parts," which is defined as "exposure to possible bodily injury from moving mechanical parts of equipment, tools, or machinery." *See* http://ssaconnect.com/tfiles/SCO-Appendicies.pdf.

no apparent conflict between the VE's testimony that Plaintiff could perform his work as a dentist and the requirements of the occupation as listed in the DOT, the ALJ was entitled to rely upon the VE's testimony.

Plaintiff argues that, notwithstanding the DOT and the VE's testimony, common experience dictates that his use of dental equipment would create a danger to himself and his patients:

> A commonsense understanding of dental procedures must carry with it a recognition that a slight limitation in dexterity, a slight limitation in attention and concentration, a slight limitation in being able to hold the head in a fixed position while working on the oral presentation of the patient simply eliminates the ability to perform those services within the standard of care.

(ECF No. 28 at 5.)

Plaintiff fails to point to legal authority supporting his assertion that the environmental condition "exposure to moving mechanical parts" is intended to encompass the use of dental tools. Instead, the only legal authority Plaintiff cites in support of his contention is *Gutierrez*, 844 F.3d 804. In *Gutierrez*, the ALJ relied upon the VE's testimony that a claimant who could not reach above shoulder level with one arm could perform the work of cashier. *Gutierrez*, 844 F.3d at 807. The Ninth Circuit rejected the plaintiff's argument that the VE's testimony conflicted with the DOT which required "reaching" in all directions. The court explained that, based on common experience, it is "unlikely and unforeseeable" that a cashier would need to reach overhead, and even more rare for one to need to reach overhead with both arms. *Gutierrez,* 844 F.3d at 808-809 & 809 n.2.

*Gutierrez* is inapposite here. Plaintiff does not contend a conflict exists between the VE's testimony and the terms of the DOT in this case, nor could he – because the DOT description for a dentist excludes exposure to moving mechanical parts. Instead, Plaintiff's argument would require that the ALJ reject the occupational

14

requirements set forth in the DOT and in the testimony of a VE in favor of "common sense" experience. Neither *Gutierrez* nor any other legal authority support such an approach. *See Hernandez v. Colvin*, 2016 WL 805252, at *8 (C.D. Cal. Feb. 29, 2016) (rejecting argument that occupation of hand packager was inconsistent with claimant's RFC precluding working with dangerous machinery because it involves fast-paced assembly line work with a conveyor belt, explaining that the DOT specifically provides that the circumstance of "moving mechanical parts" was not present); *Jones v. Colvin*, 2015 WL 1266789, at *6 (C.D. Cal. Mar. 18, 2015) (no legal authority supported plaintiff's argument that ALJ was permitted to disregard DOT definition of school bus monitor and consistent VE testimony in favor of common sense or personal experience that school bus subjects passengers to vibration). Accordingly, Plaintiff has not shown that the ALJ erred by relying upon the VE's testimony that a claimant with Plaintiff's RFC could perform the work of a dentist.

Second, Plaintiff argues that the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's testimony about the side effects from medication – including dizziness, fatigue and headaches – before concluding that Plaintiff was able to perform his past relevant work. (ECF No. 23 at 22-24.)[5] Plaintiff points out that his medications include warfarin, pantoprazole, amiodarone, lisinopril, and furosemide. (AR 220.) Plaintiff testified that he does not take pain medication for his neck impairment, explaining that he wanted to avoid any interaction with his heart medication. (AR 57.) According to Plaintiff, the side effects of his heart medication include dizziness, gas, bloating, frequent urination, and light-headedness. (AR 220.) Dr. Gaeta testified that specific restrictions were appropriate to account for Plaintiff's medications. (AR 44.) In adopting Dr. Gaeta's opinion, the ALJ accepted at least

---

[5] The Court notes that Plaintiff did not testify about any side effects from medication nor did he claim that he was unable to work due to those side effects. Rather, he testified that he was unable to work due to neck pain. (*See* AR 51-69.)

15

some of Plaintiff's alleged medication side effects. To the extent that the ALJ may have discounted other side effects alleged by Plaintiff, he did not commit error because, as discussed below, the ALJ provided legally sufficient reasons for discounting Plaintiff's testimony in its entirety.

Plaintiff also makes general assertions regarding his subjective complaints. Specifically, Plaintiff points out that he testified it is difficult for him to keep his neck straight due to pain; his neck is "severely bent over"; he has spasms in the back of his neck all day; and his neck pain limits his walking. (ECF No. 23 at 23 [citing AR 54-60].) The Commissioner acknowledges Plaintiff's "broad" recitation of his subjective complaints, but argues that Plaintiff's challenge is limited to the ALJ's rejection of his medication side effects. Thus, in responding to Plaintiff's claim, the Commissioner limits her discussion to such an argument. (ECF No. 27 at 15-16.) Indeed, in his Reply, Plaintiff does not contend that the Commissioner misconstrued his claim or failed to address it. Accordingly, it does not appear that Plaintiff intends to challenge the ALJ's overall credibility determination. Even assuming he does so intend – and further assuming that his Memorandum adequately raises such a claim – it lacks merit.

Where, as here, a claimant has presented evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms ... and determine the extent to which [those] symptoms limit his ... ability to perform work-related activities ...." SSR 16-3P, 2016 WL 1119029, at *4.[6] Absent a finding that the

---

[6] Social Security Ruling 16-3P, which became effective March 28, 2016 applies to this case. SSR 16-3P rescinded and superseded the Commissioner's prior rulings as to how the Commissioner will evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims. *See* SSR 16-3P, 2017 WL 5180304, at *1. The Ninth Circuit has found the changes in SSR 16-3P to be largely stylistic and held that SSR 16-3P is consistent in substance with Ninth Circuit precedent that existed before the effective date. *Trevizo*, 871 F.3d at 678 n.5. Accordingly, the Court relies upon Ninth Circuit authority governing the proper method for assessing a claimant's credibility.

claimant is malingering, an ALJ must provide specific, clear and convincing reasons before rejecting a claimant's testimony about the severity of his symptoms. *Trevizo*, 871 F.3d at 678 (citing *Garrison*, 759 F.3d at 1014-1015). "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834) (9th Cir. 1996)). The ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Bunnell v. Sullivan*, 947 F.2d 345-346 (9th Cir. 1991) (en banc)).

Factors an ALJ may consider when making such a determination include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, unexplained failure to pursue or follow treatment, and inconsistencies in testimony. *See Ghanim*, 763 F.3d at 1163; *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). If the ALJ's credibility finding is supported by substantial evidence in the record, the Court may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 958-959 (9th Cir. 2002).

Here, the ALJ provided several reasons for discounting Plaintiff's subjective complaints. For one, the ALJ noted that Plaintiff's medical records documented infrequent treatment for his neck condition. In particular, the ALJ noted that Plaintiff had "gone anywhere from a year to a year and a half between visits" for his neck impairment. (AR 21.) The ALJ further noted that Plaintiff's medical history was inconsistent with the alleged severity of his symptoms. In this regard, the ALJ noted that Plaintiff's MRI revealed mild to moderate findings and that those findings had not changed from 2012 to 2015. In addition, the ALJ noted that the record did not indicate that Plaintiff had ever required hospitalization or emergency room treatment

for his neck symptoms and that he received routine and conservative treatment (physical therapy). (AR 21.) These are permissible reasons supporting an adverse credibility finding. *See Mojarro v. Berryhill*, 746 F. App'x 672, 674 (9th Cir. 2018) (ALJ identified clear and convincing reasons supported by substantial evidence for discounting claimant's testimony regarding the debilitating effects of his symptoms where ALJ relied upon, among other things, gaps in claimant's treatment)*; see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009); *Orn*, 495 F.3d 638; *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The ALJ also discussed Plaintiff's daily activities. (*See* AR 20-21.) The Court need not address whether this additional reason was valid because even assuming that it was not, any error was harmless in light of the other legally sufficient reasons for the ALJ's determination. *See Molina*, 674 F.3d at 1115 (where one or more reasons supporting ALJ's credibility analysis are invalid, error is harmless if ALJ provided other valid reasons supported by the record); *Batson*, 359 F.3d at 1197 (even if the record did not support one of the ALJ's stated reasons for disbelieving a claimant's testimony, the error was harmless where ALJ provided other valid bases for credibility determination).

\*\*\*\*\*\*\*\*\*\*

For the foregoing reasons, IT IS ORDERED that Judgment be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

DATED: 3/4/2019

_____
ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE

18